UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

BIG DUTCHMAN, INC.,

    Plaintiff,

v.                                             Case No. 1:12-CV-288

MIDWEST LIVESTOCK SYSTEMS,         HON. GORDON J. QUIST
INC.,

    Defendant.
_____/

## OPINION

Plaintiff, Big Dutchman, Inc., has sued Defendant, Midwest Livestock Systems, Inc., alleging that Midwest breached an agreement to indemnify Big Dutchman for claims relating to allegedly rusting brackets on A-frame layer chicken cages. Midwest has now moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), arguing that it is entitled to judgment as a matter of law on Big Dutchman's claim.

For the following reasons, the Court will grant Midwest's motion and dismiss Big Dutchman's Complaint with prejudice.

### I. BACKGROUND

Big Dutchman is a Michigan corporation that designs, manufactures, and sells poultry and swine production equipment, including A-frame layer cage systems used to house chickens. (Compl. ¶ 2.) Midwest is a Nebraska corporation engaged in the sale and installation of livestock facilities and equipment and was a customer of Big Dutchman at least through August 31, 2005. (*Id.* ¶¶ 3, 5.) Prior to 2005, Midwest purchased A-frame cage systems, model number PT420N, from Big Dutchman. After adding additional components to these cage systems, Midwest installed

them for its customers. The unmodified cage systems consisted of various parts, including support brackets, legs, and cross arms. (Installation Guide at 4, Def.'s Br. Supp. Mot. Summ. J. Ex. A.)

In 2005, Big Dutchman and Midwest had a dispute concerning Big Dutchman A-frame cages that Midwest had installed for its customers. Around that time, several Midwest customers complained to Midwest that brackets on their cage systems were rusting so badly that they could no longer support the attached truss rods, which threatened the structural integrity of the cages. (Rayzel Dep. at 16, 88–89, Def.'s Br. Supp. Mot. Ex. B; Fuller Dep. at 17–19, Def.'s Br. Supp. Mot. Ex. C.) In turn, Midwest conveyed these complaints to Big Dutchman. Big Dutchman and Midwest disagreed about the cause of the excessive rusting. Midwest asserted that the rusting was due to a manufacturing defect—holes drilled in the brackets after they were galvanized left ungalvanized portions exposed to corrosive salt and ammonia from chicken excrement. (Rayzel Dep. at 105–06.) Big Dutchman, on the other hand, contended that the rusting was caused by water dripping from "drinkers" that Midwest had installed on the cages. (*Id.* at 106; Letter to Fuller and George from Rayzel of 10/5/11 at 2, Def.'s Br. Supp. Ex. F.)

Fremont Farms of Iowa and Center Fresh Egg Farm LLP were two of Midwest's complaining customers. Midwest installed Fremont's cages no later than October 2002, (Rayzel Dep. at 58–59), and the cage systems at Center Fresh were four to five years older than Fremont's cages. (Mem. from Walcott to Rayzel of 1/19/12, Def.'s Br. Supp. Mot. Summ. J. Ex. H.) Thus, at their time of their complaints, Big Dutchman's one-year limited warranty on Fremont's and Center Fresh's cages had expired. (Rayzel Dep. at 115.)

In February 2006, after many months of negotiations, Big Dutchman and Midwest entered into a Settlement Agreement and Release (Settlement Agreement) that resolved their dispute concerning the rusting bracket claims of Midwest's customers, including Fremont and Center Fresh.

Pursuant to the Settlement Agreement, Big Dutchman agreed to provide parts to retrofit Midwest's customers' cages and Midwest agreed to indemnify Big Dutchman for rusting bracket claims by Midwest's customers. The Settlement Agreement states, in relevant part, as follows:

> Big Dutchman has sold goods on open account to [Midwest], and asserts a balance owed on such account for goods invoiced through August 31, 2005 in the amount of $297,697. [Midwest] denies that it is indebted to Big Dutchman in this amount, and asserts that Big Dutchman is responsible for claims by [Midwest] or its customers related to allegedly rusting brackets on certain A-frame cages sold by Big Dutchman to [Midwest] (the "Rusting Bracket Claims"). . . .
>
> . . . .
>
> 2) Rusting Bracket Claims. [Midwest] has provided Big Dutchman with a list . . . of [Midwest] customers, some of which are allegedly experiencing problems with rusting brackets. Big Dutchman will provide, at no cost to [Midwest], 321,480 Truss Rod Supports, part number 38-02-V226 . . . for the retrofitting of [Midwest] customers' chicken houses. . . . *In consideration of this agreed upon resolution of the Rusting Bracket Claims, [Midwest] agrees to indemnify Big Dutchman and hold it harmless against any Rusting Bracket Claims asserted by any MLS customer.*

(Settlement Agreement, Compl. Ex. 1 (italics added).)[1]

Five years later, in the Spring of 2011, Fremont noticed a different rusting problem with its cages—this time the legs and cross arms. (Fuller Dep. at 20–21.) Similar to the brackets in 2006, the legs and cross arms attached to the brackets were rusted to an extent that severely compromised the structural integrity of the cages. (*Id.* at 28.) The rusting was limited to the areas where Midwest had installed the drinker feeders. (Letter of 10/5/11 from Rayzel to Fuller and George at 2, Def.'s Br. Supp. Mot. Summ. J. Ex. F.) Fremont initially notified Midwest about the rusting parts, but subsequently contacted Big Dutchman and demanded that it fix the problem.[2] (Fuller Dep. at 28.)

---

[1] Pursuant to the Settlement Agreement, the parties also released any claims they had against each other relating to goods Big Dutchman sold to Midwest prior to August 31, 2005. (Settlement Agreement ¶ 3.)

[2] A factual dispute exists regarding whether Joe Fuller, Fremont's Vice President, threatened legal action against Big Dutchman. That dispute, however, is not material to the Court's analysis of the instant motion.

Big Dutchman conducted a site review and determined that the rusting legs and cross arms were part of the same problem that gave rise to the earlier rusting bracket claims. (Farm Report at 1–2, Pl.'s Resp. Ex. H.) Although Big Dutchman knew that it was not legally obligated on its warranty for the rusting legs and cross arms on Fremont's cages, (Rayzel 10/5/11 Letter at 3 (acknowledging that the situation was "not a warranty case")), Big Dutchman agreed to provide Fremont splint-like parts that could be bolted over the severely rusted legs and cross arms. (Rayzel Dep. at 128–29.)

In September 2011, Big Dutchman and Fremont began to negotiate a settlement of Fremont's 2011 claim concerning rusting parts. Thereafter, Big Dutchman's counsel notified Midwest of Fremont's 2011 rusting parts claim and demanded that Midwest indemnify Big Dutchman under the Settlement Agreement. Midwest did not respond. Ultimately, Big Dutchman agreed to provide Fremont total consideration of $300,000 in parts and related expenses to settle Fremont's claim. Big Dutchman sent a proposed settlement agreement to Fremont that referenced "continued problems with the A-Frame cages relating to rusting brackets." (1st Draft Settlement Agreement, Def.'s Br. Supp. Mot. Summ. J. Ex. D.) However, Fremont objected to Big Dutchman's characterization of the issue as "rusting brackets" and replaced the "rusting brackets" language with "rusting legs and crossarms." Big Dutchman then sent Fremont a revised draft that also referred to "rusting brackets," but Fremont also struck that language from the draft. (2d Draft Settlement Agreement, Def.'s Br. Supp. Mot. Summ. J. Ex. E.) The agreement Big Dutchman and Fremont ultimately signed refers to "rusting A-Frame cages" and omits any reference to "rusting brackets." (Compl. Ex. 4.)

Center Fresh also made a claim to Big Dutchman in 2011 for rusting cage parts. Big Dutchman notified Midwest that it intended to settle Center Fresh's claim and demanded that Midwest indemnify it pursuant to the Settlement Agreement. Midwest did not respond. Thereafter, Big Dutchman settled Center Fresh's claim for a sum of $90,000, allowing Center Fresh the option

4

to receive cash or to apply the settlement amount toward purchases from Big Dutchman. (Letter Agreement between Big Dutchman and Center Fresh, Def.'s Br. Supp. Mot. Summ. J. Ex. K.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. DISCUSSION

In its sole claim, Big Dutchman alleges that Midwest breached its obligation under the Settlement Agreement to indemnify Big Dutchman for the claims Fremont and Center Fresh made in 2011 concerning rusting cage parts. Midwest contends that it is entitled to summary judgment because Fremont's and Center Fresh's 2011 claims do not trigger the indemnification provision of the Settlement Agreement and, in any event, Big Dutchman's decisions to settle the Fremont and Center Fresh claims were unreasonable as a matter of law.

Contractual indemnity agreements are enforceable to the same extent as other contracts. *Hubbell, Roth & Clark, Inc. v. Jay Dee Contractors, Inc.*, 249 Mich. App. 288, 291, 642 N.W.2d 700, 702 (2001) (per curiam). The scope of an indemnitor's obligation to indemnify is determined

from the language of the contract. *See Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.*, 262 Mich. App. 345, 351, 686 N.W.2d 756, 761 (2004). Contracts should be construed to give effect to the intentions of the parties and to give a reasonable meaning to all provisions. *Klever v. Klever*, 333 Mich. 179, 186, 52 N.W.2d 653, 656–57 (1952). If the language of the contract is clear and unambiguous, the court should construe it according to its plain sense and meaning. *Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 198, 702 N.W.2d 106, 113 (2005). A contract is ambiguous if its provisions are capable of conflicting interpretations. *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 467, 663 N.W.2d 447, 453 (2003). Ambiguity exists only if there are two or more reasonable interpretations or if the provisions cannot be reconciled with each other. *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 722, 565 N.W.2d 401, 415 (1997). A court may not rewrite a contract under the guise of interpretation if the terms are clear and unambiguous. *Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 130–31, 743 N.W.2d 585, 588 (2007).

The Michigan Court of Appeals explained the general rules for determining contractual indemnity claims in *Grand Trunk Western Railroad, Inc. v. Auto Warehousing Co.*, 262 Mich. App. 345, 686 N.W.2d 756 (2004):

> Two general principles of law, applicable to contractual indemnity in this context, are well-established. First, if an indemnitee settles a claim against it before seeking the approval of, or tendering the defense to, the indemnitor, then the indemnitee must prove its *actual* liability to the claimant to recover from the indemnitor. However, the indemnitee who has settled a claim need show only *potential* liability if the indemnitor had notice of the claim and refused to defend.
>
> . . . .
>
> In *Ford* [*v. Clark Equipment Co.*, 87 Mich. App. 270, 274 N.W.2d 33 (1978)], this Court explained the analysis and proof required for potential liability, i.e., in a case such as this one, in which a seasonable tender of defense was made with notice that a settlement will be entered and the tender of defense was refused.

> To recover under these circumstances the indemnitee must show that the fact situation of the original claim is covered by the contract of indemnity and that the settlement is reasonable.
>
> Potential liability actually means nothing more than that the indemnitee acted reasonably in settling the underlying suit. The reasonableness of the settlement consists of two components, which are interrelated. The fact finding must look at the amount paid in settlement of the claim in light of the risk of exposure. The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed. If the amount of the settlement is reasonable in light of the fact finder's analysis of these factors, the indemnitee will have cleared this hurdle.

*Id.* at 355, 686 N.W.2d at 763–64 (quoting *Ford*, 87 Mich. App. at 277–78, 274 N.W.2d at 36–37) (citations omitted) (italics in original).[3]

In analyzing Big Dutchman's right to indemnity, the Court first asks whether the Fremont and Center Fresh claims are within the scope of the indemnity provision, which obligates Midwest to "indemnify Big Dutchman and hold it harmless against any Rusting Bracket Claims asserted by any [Midwest] customer." "The threshold question whether the fact situation is covered by the indemnity contract generally requires only a straightforward analysis of the facts and the contract terms." *Id.* at 356–57, 686 N.W.2d at 764.

Midwest contends that the claims at issue are not covered by the indemnification provision because the claims involve rusting legs and cross arms but not brackets. Big Dutchman responds that the parties defined the term "Rusting Bracket Claims" broadly, as "claims by [Midwest] or its customers *related* to allegedly rusting brackets." (Italics added). Big Dutchman contends that this language is broad enough to include claims concerning rusting legs and cross arms because these

---

[3] The *Grand Trunk* court cited *Trim v. Clark Equipment Co.*, 87 Mich. App. 270, 274 N.W.2d 33 (1978), as *Ford v. Clark Equipment Co*, 87 Mich. App. 270, 274 N.W.2d 33 (1978). Although *Trim* was the first listed of the two consolidated cases, some courts refer to the case as *Ford*, while others refer to it as *Trim*. For purposes of this Opinion, the Court refers to the case as *Ford*.

parts, along with the brackets, are connected and form the support structure for the cages. Big Dutchman further argues that the Court should construe the "related to" language broadly because in negotiating the Settlement Agreement in 2006, the parties sought to resolve not only the rusting bracket issue, but more generally their dispute over responsibility for premature rusting. Thus, Big Dutchman would have the Court construe the phrase "Rusting Bracket Claims" to include any claim involving a rusting cage part if the rust could have resulted from the same source or condition that caused the brackets to rust prior to 2006.

Big Dutchman's argument is at odds with the plain language used in the Settlement Agreement. Rusting Bracket Claims are "claims . . . related to . . . rusting brackets." "The word 'related' ordinarily means being 'associated' or 'connected.'" *DaimlerChrysler Corp. v. G Tech Professional Staffing, Inc.*, 260 Mich. app. 183, 186–87, 678 N.W.2d 647, 650 (2003) (quoting *Random House Webster's College Dictionary* (2d ed. 1997)). The claims encompassed by the Settlement Agreement are thus limited to claims associated with rusting brackets. Claims concerning other rusting parts, such as legs and cross arms, are not Rusting Bracket Claims. While it is true that claims about rusting legs and cross arms are, in a sense, related to claims for rusting brackets because the rust on all of the parts may have resulted from the same cause (leaking water), the language focuses on the subject of the claim. Moreover, paragraph 2, which addresses "Rusting Bracket Claims," describes the problem and the fix for rusting brackets. The fix for the rusting legs and cross arms was different. Therefore, the Fremont and Center Fresh 2011 claims are covered by the indemnification provision only if those claims involve rusting brackets.

Regarding Fremont's claim, the Court concludes that no genuine issue of fact remains that Fremont's claims were limited to rusting legs and cross arms. Joe Fuller, Fremont's Vice President, testified that the 2011 claim concerned rusting legs and cross arms, but not rusting brackets. (Fuller

Dep. at 20–23.) Big Dutchman contends that an issue of fact remains because Big Dutchman shipped over 1,000 brackets to Fremont as part of the fix for the 2011 rusting parts problem, and Fremont did not reject them. Big Dutchman further notes that its President, Clovis Rayzel, testified that a Fremont employee specifically requested that Big Dutchman send brackets. (Rayzel Dep. at 124–25.) Rayzel also testified that Big Dutchman's Service Manager told Rayzel that the individual who installed the parts on Fremont's cages told the Service Manager that the brackets Big Dutchman shipped to Fremont were installed on the cages. (*Id.* at 125.) However, Fuller testified that he told Rayzel to take back the brackets—that at the time of his deposition were "out in the damn shed"—but Rayzel declined to do so because of the freight costs. (Fuller Dep. at 88.) Moreover, Rayzel's testimony about what an installer told Big Dutchman's Service Manager is hearsay, which the Court may not consider in deciding a summary judgment motion. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). Finally, and probably most importantly, brackets were not among the parts listed in the attachment to the 2011 settlement agreement between Big Dutchman and Fremont that the parties intended as a solution to the 2011 rusting parts issue. (Compl. Ex. 3.)

As for the Center Fresh claim, the Court concludes that a dispute of fact remains whether rusting brackets were a part of Center Fresh's 2011 rusting parts claim. The only summary judgment evidence in the record is the April 26, 2012, letter agreement between Big Dutchman and Center Fresh, which suggests that rusting brackets may have been part of Center Fresh's claim. Therefore, the Court cannot say as a matter of law at this juncture whether all or part of Center Fresh's 2011 claim is outside the scope of the indemnification provision.

Even if an issue of fact remains about whether the claims are covered by the indemnification provision, Midwest is entitled to summary judgment because Big Dutchman's decision to settle the

claims was unreasonable as a matter of law. Because it is undisputed that Big Dutchman notified Midwest of the claims and demanded that Midwest indemnify Big Dutchman for the claims, Big Dutchman need only show potential, rather than actual, liability on the claims. *Grand Trunk*, 262 Mich. App. at 354–55, 686 N.W.2d at 763. As noted, potential liability simply means that the indemnitee acted reasonably—an inquiry which considers the amount paid to settle the claim in light of the risk of exposure. *Ford*, 87 Mich. App. at 278, 274 N.W.2d at 36–37. "The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed." *Id.* at 278, 274 N.W.2d at 37. When the indemnitee has an absolute defense to the claim, any settlement will be deemed unreasonable as a matter of law. *Matusak v. Houseman Constr. Co.*, No. 306904, 2012 WL 5193122, at *3 (Mich Ct. App. Oct. 18, 2012) (per curiam) (holding that because the indemnitor had an absolute defense to the original plaintiff's claims, no reasonable jury could have concluded that the decision to settle was reasonable).

In this case, Midwest has shown that both Big Dutchman and Midwest had an absolute defense to Fremont's and Center Fresh's claims, had they asserted them in litigation. Both claims would have been barred by the four-year statute of limitations under Michigan's version of the Uniform Commercial Code for claims alleging breach of contract for the sale of goods. M.C.L. § 2725(1).[4] A cause of action for breach of a contract for sale accrues when the breach occurs, which is generally when the tender of delivery is made. M.C.L. § 2725(2). Midwest completed its installation of Fremont's cages no later than October 2002, and Center Fresh's cages were about five years older than Fremont's cages. Because the statute of limitations had long expired at the time Big Dutchman settled the claims at issue, Big Dutchman had no exposure on the claims.

---

[4] Big Dutchman does not dispute that the A-frame cages are "goods" as defined by the Michigan Uniform Commercial Code.

Big Dutchman does not deny that the statute of limitations would have provided a complete defense to Fremont's and Center Fresh's claims in litigation. It argues, however, that the indemnification provision in this case applies to all claims, whether or not asserted in litigation, and "is much broader than indemnity provisions generally found in insurance cases or where a duty to defend is included, which are limited to legally cognizable claims." (Pl.'s Resp. Br. at 11.) As the Court understands it, Big Dutchman essentially contends that the indemnification provision affords it indemnity from Midwest for any claim within the scope of the provision even if the claim is legally baseless.

A review of contractual indemnification cases shows that Big Dutchman's argument lacks merit. Contrary to Big Dutchman's argument, the applicability of the potential liability rule does not depend on the existence of a contractual duty to defend. For example, the indemnity provision in *Ford* lacked a contractual duty to defend and, like the provision in this case, required the indemnitor to "indemnify and save harmless the buyer from and against any and *all claims* . . . ." 87 Mich. App. at 273, 274 N.W.2d at 34 (italics added). Yet, the court applied the potential liability rule. *See id.* at 278–29, 274 N.W. 2d at 36–37. Similarly, in *Detroit Edison Co. v. City of Detroit*, Nos. 278778, 286460, 2009 WL 1830740 (Mich. Ct. App. June 25, 2009) (per curiam), the court noted that the indemnity clause did not impose a duty to defend on the indemnitor, but the court still applied the potential liability standard to determine whether the indemnitee's settlement was reasonable. *See id.* at *3–4. And, although Big Dutchman states that the *Grand Trunk* court "relied on rules of law applicable to duty to defend cases," (Pl.'s Resp. Br. at 11), this characterization is misleading, if not simply wrong. In fact, the trial court in *Grand Trunk* held that the defendant breached its contractual duty to defend under the lease, but the court of appeals said that the "defendant's contractual duty to defend is not, in and of itself, dispositive of this case." 262 Mich.

App. at 354, 686 N.W.2d at 763. Instead, the court of appeals applied well-established principles of contractual *indemnity*, including the potential liability standard, and affirmed on that basis. *Id.* at 354–55, 686 N.W.2d at 763–64.[5] Nor has Big Dutchman offered any persuasive reason to conclude that the potential liability standard has no application to claims settled outside of litigation. A party's decision to settle a claim short of litigation says nothing about the showing it must make for indemnification. *See St. Luke's Hosp. v. Giertz*, 458 Mich. 448, 454, 581 N.W.2d 668 (1998) ("A person legally liable for damages who is entitled to indemnity may settle the claim and recover over against the indemnitor, even though he has not been compelled by judgment to pay the loss. In order to recover, the indemnitee settling the claim must show that the indemnitor was legally liable, and that the settlement was reasonable.") (quoting 41 Am. Jur. 2d, Indemnity, § 46 at 380).

Finally, Big Dutchman argues that requiring it to show potential liability would improperly render the indemnification provision superfluous because at the time the parties executed the Settlement Agreement, all potential rusting bracket claims were barred by the statute of limitations and Midwest would never have had to make good on its promise to indemnify Big Dutchman. Big Dutchman thus asserts that Midwest's promise to indemnify was "pie in the sky," while Midwest received almost $300,000 in cash consideration. Perhaps Big Dutchman got a bad deal, bad advice, or both. Or, perhaps, Big Dutchman believed that satisfying end-user customer dissatisfaction was in its long term best financial and marketing interests. The other side of the coin, of course, is that Big Dutchman, itself having no liability, could have simply rejected Fremont's and Center Fresh's claims and been no worse off under the Settlement Agreement than if the claims had never been

---

[5] Big Dutchman also states that the court in *DaimlerChrysler Corp. v. Ajilon Services, Inc.*, No. 241954, 2004 WL 435375 (Mich. Ct. App. Mar. 9, 2004), held that the indemnity provision in that case allowed the plaintiff to be indemnified for any loss, not just those losses associated with legally cognizable claims. This Court reads *DaimlerChrysler Corp.* differently. The court said that "[t]he specific language in the indemnification clause *does not limit plaintiff's right to indemnification to only legal proceedings*." *Id.* at *3 (italics added).

12

made. In any event, this Court can neither rewrite the Settlement Agreement nor ignore well-established law governing Big Dutchman's right to indemnification.

## IV. Conclusion

For the foregoing reasons, the Court will grant Midwest's Motion for Summary Judgment and dismiss Big Dutchman's Complaint with prejudice.

An Order consistent with this Opinion will be entered.


Dated: February 28, 2013 /s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE